AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | )    Case No.   1:18-SW-276 |
| One Black Apple iPhone, Model X, and one rose gold Apple iPhone, Model 8, currently located at ATF Washington Division Evidence Vault | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
One Black Apple iPhone, Model X, and one rose gold Apple iPhone, Model 8, currently located at ATF Washington Division Evidence Vault, as further described in Attachment A (Property to be Searched).

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B (Items to be Seized).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SAUSA Stephanie Williamson/AUSA Nicholas Murphy     Bernard E. Mensah, Special Agent, ATF
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   9 May 18

_____ /s/_____
City and state:   Alexandria, Virginia        Ivan D. Davis
**United States Magistrate Judge**

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched is one black Apple iPhone, Model X, and one rose gold

Apple iPhone, Model 8, cellular devices (hereinafter the "DEVICES") that were seized by ATF

from the person of Keith Haddock, II incident to his arrest on April 27, 2018.  The DEVICES are

currently in ATF custody.

This warrant authorizes the forensic examination of the DEVICES for the purpose of

identifying the electronically stored information described in Attachment B.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.      All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. § 922 and/or 18 U.S.C. § 1952 and involve HADDOCK since November 1, 2017, including:

      a.  Incoming/outgoing/missed phone call log(s);

      b.  SMS/MMS messages;

      c.  voicemail messages;

      d.  photographs and videos;

      e.  lists of customers and related identifying information (contact list);

      f.  any information related to the geographic location of the DEVICES;

      g.  The cellular telephone number;

      h.  types, amounts, and prices of firearms trafficked as well as dates, places, and amounts of specific transactions;

      i.  any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information);

      j.  any information recording HADDOCK's schedule or travel from November 1, 2017 to the present;

      k.  any information related to HADDOCK's involvement in coordinating prostitution activities; and

      l.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records involving the Internet:

a.   records of Internet Protocol addresses used;

b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3

F I L E D
MAY - 9 2018
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE BLACK APPLE iPHONE, MODEL X, AND ONE ROSE GOLD APPLE iPHONE, MODEL 8, CURRENTLY LOCATED AT ATF WASHINGTON DIVISION EVIDENCE VAULT; 7799 LEESBURG PIKE, SUITE 1050N, FALLS CHURCH, VA 22043 | Criminal No. 1:18-SW-276 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Bernard E. Mensah, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of electronic devices.  The devices to be searched are described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under Federal Rules of Criminal Procedure 41(c), 41(e)(2)(A) and 41(e)(2)(B).

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been so employed since May of 2017.  I am currently assigned to the ATF Washington Field Division's Group II.  My assignments include investigating individuals who are involved in the illegal possession and transfer of firearms, violent crimes involving firearms, and narcotics and firearms trafficking.  I have conducted and participated in

surveillance, executed search warrants and arrest warrants, developed sources of information, and conducted international operations that collaborated with foreign law enforcement entities.

3.      I received a Bachelor's degree in Criminal Justice and Social Science from Ramapo College of New Jersey, Mahwah, NJ in 2006.  I served as a United States Secret Service Police Officer from 2007 to 2008 and as a Federal Air Marshal with the United States Federal Air Marshal Service from 2008 to 2017.  I am also a graduate of the Uniform Police Training Program, the Criminal Investigator Training Program, and the ATF Special Agent Basic Training program, which are all conducted by the Federal Law Enforcement Training Center at Glynco, GA.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  All observations referenced in this affidavit that I did not personally make were relayed to me by the person(s) who made such observations or in reports that detailed the events described by those person(s).

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 922(g)(1), among other crimes, have been committed by Keith Haddock, II ("HADDOCK"). There is also probable cause to search the property described in Attachment A and to seize the evidence, fruits, instrumentalities, and contraband set forth in Attachment B relating to these violations.

## **PROBABLE CAUSE**

6.      This investigation originated on or about January 18, 2018, when ATF SA Kelly

Long reviewed Firearms Trace Summary Reports regarding three firearms recovered from two

stolen rental vehicles in Maryland.  These reports showed Amanda Ward ("Ward") had recently

purchased one of the three recovered firearms from a Federal Firearms Licensee ("FFL") located

in the Eastern District of Virginia.

7.      Specifically, on December 20, 2017, Maryland Transportation Authority Police

("MDTAP") recovered the first two firearms from a repossessed rental vehicle.  Budget Rental

Car ("Budget") located the overdue vehicle, a 2017 GMC SUV, on December 14, 2017, at the

Knights Inn Hotel in Laurel, Maryland.  Sharon Haddock was the listed renter on the vehicle's

rental agreement.  Law enforcement databases confirmed that Sharon Haddock is HADDOCK's

mother.  On December 20, 2017, Budget was able to gain key-entry access to the locked vehicle

and employees who were cleaning the vehicle found two handguns, which Budget quickly reported

to MDTAP.  An MDTAP Detective and MDTAP officers responded to the BWI Airport Budget

facility and processed the vehicle for evidence.

8.      While processing the vehicle for evidence, law enforcement recovered: a

Springfield Model XD .45 caliber pistol with serial number US596507; a Glock Model 17 9

millimeter pistol with serial number VUH372; and a hotel receipt for a one night stay (12/6/2017-

12/7/2017) at the Knights Inn, located at 3380 Fort Meade Road, Laurel, Maryland.  The hotel

receipt listed HADDOCK as the renter.

3

9.      I discovered through law enforcement databases that HADDOCK was convicted of felony Assault in Montgomery County Circuit Court on July 8, 2013 and felony Conspiracy to Commit Robbery in Montgomery County Circuit Court on March 11, 2010.   As a result, HADDOCK is not lawfully able to possess a firearm.

10.     An ATF Firearms' E-Trace showed that Ward purchased the aforementioned recovered Springfield Model XD .45 caliber pistol from Dominion Defense at the Fishersville Gun Expo on December 10, 2017.    The recovered Springfield pistol was in the stolen rental vehicle within four (4) days of Ward's purchase from Dominion Defense.

11.     Then, on January 12, 2018, the Anne Arundel County Police Department ("AACPD") recovered a second rental vehicle, which Enterprise Holdings had reported stolen on January 3, 2018, from a parking lot adjacent to a Burlington Coat Factory in Hanover, Maryland. Marcus Allen ("Allen") was the listed vehicle renter.   During a vehicle inventory, an AACPD Officer recovered: a Taurus Model Millennium G2 9 millimeter pistol with serial number TKT02098, loaded with six rounds in the magazine and one in the chamber; and a prescription bottle with Allen's name on it.   I discovered through law enforcement databases that Allen was convicted of felony Burglary in Calvert County Circuit Court on or about February 7 and June 28, 2005.   As a result, Allen is not lawfully able to possess a firearm.

12.     An ATF Firearms E-Trace showed that Ward purchased the aforementioned recovered Taurus Model Millennium G2 9 millimeter pistol from CK3 Guns at the SGK Gun Show in Fredericksburg, Virginia, within the Eastern District of Virginia, on December 16, 2017.   Law enforcement recovered the firearm within twenty-seven (27) days of its purchase by Ward.   In a

4

subsequent interview with ATF, Ward stated that she did not know Allen and that she provided the referenced firearm to HADDOCK shortly after purchasing it.

13.    SA Long visited Dominion Defense on January 19, 2018 and spoke with two employees. One of the employees specifically recalled Ward and said Ward was with a skinny white female with red hair (known to law enforcement as Brittany Blanken), a black male who had freckles or warts all over his face (known to law enforcement as HADDOCK), and a white male (known to law enforcement as Ronald Blanken), at the Fishersville Gun Expo on December 10, 2017. Subsequently, the employee identified photographs of Brittany Blanken, HADDOCK, and Ronald Blanken as the previously described individuals.

14.    Further investigation showed that Ward and her boyfriend, Ronald Blanken, who is also Brittany Blanken's brother, purchased twenty-eight (28) firearms from FFLs within the Eastern District of Virginia between December 3, 2017 and January 6, 2018. In addition, Ward purchased two (2) firearms from a FFL located in the Western District of Virginia. Nineteen (19) of the firearms were purchased by Ward, and eleven (11) of the firearms were purchased by Ronald Blanken after Trojan Arms and Tactical informed Ward she was "flagged."

15.    Employees and owners of the various FFLs where Ward and Ronald Blanken purchased these firearms recalled Ward visiting gun shows and FFLs in a group consisting of another female and two males. Specifically, multiple eye witnesses stated that they saw Ward with a skinny white female with red hair (later identified as Brittany Blanken), a black male who had freckles or warts all over his face (known to law enforcement as HADDOCK), and another white male (known to law enforcement as Ronald Blanken).

5

### A.   HADDOCK's Social Media Posts

16.    I identified the "frankwhite4g" Instagram page as belonging to HADDOCK based on comparing photographs posted within the Instagram account to HADDOCK's mug shot. While reviewing HADDOCK's public Instagram account, "frankwhite4g," I witnessed numerous pictures and videos of HADDOCK possessing and brandishing an array of firearms. For example, on March 29, 2016, HADDOCK posted a video of himself in a car smoking what appears to be a marijuana "blunt" that pans to what appears to be a silver and black firearm in HADDOCK's lap. On July 3, 2016, HADDOCK posted a video of himself in a car pointing what appears to be a silver firearm at the camera. Then, on August 25, 2016, HADDOCK posted a clip of a rap video featuring himself in which what appears to be a black pistol is visible in HADDOCK's hand and shorts pocket at various points in the video. In addition, on September 27, 2016, HADDOCK posted a video of himself in a car, during which HADDOCK is brandishing at the camera what appears to be a black firearm with a red laser sight. On October 26, 2016, HADDOCK posted a photo of himself in a car in which HADDOCK brandishes what appears to be a black firearm at the camera. Further, on December 8 and 15, 2016, HADDOCK posted a clip of a rap video that features HADDOCK brandishing what appears to be two black firearms at the camera – one of which has a red laser sight. Then, on December 20, 2016, HADDOCK posted a photograph of himself and commented that, "I'm just ridin round town wit my new pistol cause I dnt fuck wit niggas like I use to do!!.." On September 27, 2017, HADDOCK posted a clip of a rap video during which HADDOCK brandishes at the camera what appears to be a black pistol with a red laser sight. Later, on November 30 and December 8, 2017, HADDOCK posted clips of a rap video

6

during which HADDOCK brandishes what appears to be a black pistol with a large capacity magazine. Then, on December 13, 2017, HADDOCK posted a photograph of himself holding what appears to be the same black firearm with the large capacity magazine from the November 30 and December 8, 2017, rap video clips. HADDOCK commented on the photograph, "I just pray and keep it on me when I pray its even on me!!" Then, on February 5 and 6, 2018, HADDOCK posted another rap video of himself in possession of what appears to be a black firearm with a large capacity magazine and what appears to be a black assault style rifle.

**B.    Brittany Blanken's Social Media Posts**

17.    A review of Brittany Blanken's public Instagram account included numerous Instagram posts referencing prostitution and referencing HADDOCK as her pimp. For example, on January 19, 2018, BLANKEN posted a video with HADDOCK, with a caption that referenced HADDOCK as, "That's Daddy…," followed by several emoticons, including three money emoticons. Based on my training and experience, I know that the term "daddy" in the prostitution world is a common reference for a prostitute's pimp. Then, on January 20, 2018, Brittany Blanken posted a video of several containers of food at a restaurant with the caption, "Daddy make sure we Eat !!!" In addition, on January 23, 2018, Brittany Blanken posted a photograph of several shopping bags with the caption, "Daddy keep his Bitch on Top !!!" Then, on February 5, 2018, Brittany Blanken posted a photograph of the following statement: "GET U A BITCH THAT WON'T REST UNITL SHE GET U RICH!" Finally, on February 8, 2018, Brittany Blanken posted a photograph of a meme that reads, "It be all fun & games till these hoes fall out with da

friend they use to sell pussy with." Brittany Blanken commented on this photo, "Real shit these Bitchez Fake as Fuck Out Here Lmao Bitch you the same one Who was out there doing it lmao."

18.   . My review of public records showed that on April 3, 2015, Brittany Blanken was charged in Prince George's County District Court with three counts of Prostitution and pled guilty to one count on October 7, 2015. Then, on September 21, 2017, in what is currently a pending matter, Brittany Blanken and HADDOCK were charged in Prince George's County District Court with four counts of Prostitution and three counts of Human Trafficking.

## C.   Ward Interview

19.   On February 15, 2018, SA Catherine Fields and I interviewed Ward in reference to nineteen (19) firearms Ward purchased at multiple gun shows and FFLs, including seventeen (17) firearms she purchased at FFLs within the Eastern District of Virginia between December 3 and 26, 2017.

20.   During the interview, Ward confirmed she had purchased several guns, including a purple pistol. Ward asked if the interview had anything to do with Brittany Blanken, whom Ward referred to as her "sister in law."

21.   Ward described Brittany Blanken's latest boyfriend and/or "daddy" as a very tall, skinny, light skinned, black male with freckles and tattoos and said she knew him as "Frank." Ward then accessed Frank's Instagram page, which had the user ID "frankwhite4g," from her phone. This is the same Instagram profile, as described above, that law enforcement had identified as belonging to HADDOCK. Ward stated that the last time she met up with Brittany Blanken and Frank was to attend the gun show in Doswell, VA.

22.    Ward explained that Brittany Blanken called her "the other day" to inform Ward that she (Brittany Blanken) had been arrested with the purple SCCY pistol Ward had purchased for her. Ward explained that Frank told Brittany Blanken, "You have 24 hours to let [Ward] know and that you're [Brittany Blanken] going to take a stolen gun charge." Ward explained that in order to keep Ward out of trouble, Frank commanded Brittany Blanken to alert Ward about the recovered firearm and to tell Ward that she, Brittany Blanken, would be confessing to a stolen gun charge. Frank told Brittany Blanken that Ward was doing them a favor and helping them make money, therefore, Ward should not be responsible for Brittany Blanken's carelessness. Ward further stated that Brittany Blanken told her that one of Frank and Brittany Blanken's rental vehicles containing a firearm Ward had purchased for them had been impounded.

23.    WARD said that Brittany Blanken lived in hotels in Maryland or Washington, DC, and that her last known residence was the Knights Inn Hotel in Prince George's County, Maryland. She further stated that Brittany Blanken was a "whore" and had had several boyfriends, "daddies," or pimps. Ward stated that Brittany Blanken only gets in relationships with felons.

24.    Ward explained that Brittany Blanken had called and asked Ward to "do gun shows with her" because Brittany Blanken and Frank had stolen firearms from gun shows in the past but did not want to continue doing so for fear of getting caught. Ward stated that she agreed to purchase firearms on behalf of Brittany Blanken and Frank in exchange for three thousand dollars ($3,000) and an iPad. Ward explained that Frank purchased an iPad Pro for Ward from the Sprint store in Manassas, VA for approximately $300 and stated that Frank pays the monthly service bill

9

for the device, but that he never paid Ward the $3,000 that he promised her for buying guns on his behalf.

25.     Ward said that Frank would research gun shows and FFLs prior to picking her up on the way to their destination. Ward further stated that Frank and Brittany Blanken accompanied Ward to every location at which she made a firearms purchase, and that Frank either accompanied Ward into the location or stayed in the car while Ward purchased the firearms Frank wanted. Ward stated that Frank would provide her with cash for the purchases either by sliding money in her pocket at the time of purchase, or handing her cash in the car before Ward entered the gun show or FFL. Ward stated that Frank usually provided her with $1,100 to $1,500 at a time for the firearms purchases.

26.     Ward stated that, after purchasing the firearms for Frank, she would put the firearms in the trunk of the SUV for Frank to retrieve. On some occasions, Ward would place the firearms in the passenger compartment of the SUV and Frank would immediately begin manipulating the recently purchased firearms.

27.     When asked why Frank could not purchase his own firearms, Ward said she suspected he was a felon. Brittany Blanken had previously told Ward that Frank had "done some shit," and Ward believed Frank was a drug dealer. Ward further advised that Frank was not a resident of Virginia and, therefore, could not buy firearms in Virginia.

28.     Ward stated that she did not know what Frank did with the firearms after she transferred them to him, but she was positive that she saw some of the firearms she purchased for Frank in "his little music videos." Then, Ward showed agents videos of Frank possessing some

of the firearms she had purchased for him, which Ward accessed on the Instagram profile "frankwhite4g." Ward recognized the firearm with the "extended clip" in the video "Curtains" as one she purchased for Frank.

29.     Brittany Blanken previously told Ward that she and Frank were making money from the firearms Ward purchased for Frank. Ward explained that Frank told her he was working with an unknown individual to create fake Bills of Sale for the firearms she had purchased for him, and that Frank had shaved off the serial numbers on those guns.

30.     Ward stated that she stopped purchasing firearms on behalf of Frank on December 27, 2017, when an employee at Trojan Arms and Tactical told her she was "flagged." The very next day, Frank had Ronald Blanken purchase firearms for him. Ward stated that, in order to convince Ronald Blanken to purchase firearms on Frank's behalf, Frank and Brittany Blanken promised to purchase a Mossberg Shockwave shotgun for Ronald Blanken, but Ronald Blanken only received $100 from Frank for the firearms purchases and stopped buying firearms for Frank thereafter.

**D.     Ronald Blanken Interview**

31.     On February 20, 2018, SA Fields and I interviewed Ronald Blanken in Manassas, Virginia.

32.     During the interview, Ronald Blanken stated that Frank, who is known to law enforcement as HADDOCK, and Brittany Blanken informed him and Ward about firearms they lost in a repossessed rental vehicle that was towed from a hotel where Frank and Brittany Blanken were staying.

11

33.     Ronald Blanken stated that Ward approached him with the idea to purchase firearms for Frank after Brittany Blanken called Ward to offer $3,000 for Ward's and Ronald Blanken's participation. Ronald Blanken agreed to participate in the scheme because he believed Brittany Blanken and Frank were going to give Ronald Blanken and Ward the $3,000 payment. Brittany Blanken also offered to buy him a Mossberg Shockwave firearm for Christmas as an additional payment.

34.     Ronald Blanken recalled attending approximately four gun shows with Ward, Frank, and Brittany Blanken. Ronald Blanken explained that, initially, Ward was going to put all the firearms in her name, but after Trojan Arms and Tactical refused to sell Ward any additional firearms, Ronald Blanken started to purchase firearms for Frank. Ronald Blanken said he thought if he purchased firearms for Frank, Ward would eventually receive the $3,000 Frank and Brittany Blanken had promised them. However, Ronald Blanken stated that Frank only gave him $100 once and that was the only payment he ever received for purchasing firearms for Frank.

35.     Ronald Blanken stated that Frank found all the gun shows they attended. Ronald Blanken remembered that Frank had two firearms in the vehicle the first time Frank and Brittany Blanken picked up Ward and Ronald Blanken to attend a gun show together. Brittany Blanken bragged about how she and Frank had stolen firearms from at least one gun show before Ronald Blanken and Ward started purchasing firearms for them.

36.     Ronald Blanken explained that Frank would hand him cash in the car prior to going into gun shows. Ronald Blanken further stated that on some of the occasions he purchased firearms for Frank, he would put the firearms in the trunk of Frank's SUV after Ronald Blanken purchased

12

them.  Ronald Blanken recalled that Frank would sometimes retrieve the firearms from the trunk of the SUV during the drive home from the purchase locations.

37.     Ronald Blanken stated that the last time he went to purchase firearms for Frank, Brittany Blanken and Frank argued because the gun show did not have all the firearms Frank wanted.  Ronald Blanken further stated that the firearms Frank wanted were too expensive for Frank.  Ronald Blanken stated that during the argument, Frank told Brittany Blanken, "You gonna. spend all that money and only be able to make fifty dollars."  Ronald Blanken did not know what happened to the firearms after he and/or Ward purchased them and gave them to Frank.

38.     Ronald Blanken said he thought Frank was a Washington, D.C. resident and that, as a D.C. resident, Frank could not purchase his own firearms in Virginia.  Ronald Blanken explained that Brittany Blanken and Frank were living out of hotels in Washington, D.C.

39.     SA Fields showed Ronald Blanken HADDOCK's YouTube rap video, "Blessings." Ronald Blanken stated that he recognized four firearms from the video as firearms Ronald Blanken had purchased for Frank.  One of the firearms Ronald Blanken recognized was an AK-47 rifle possessed by HADDOCK in the "Blessings" video.  Ronald Blanken also recognized the purple SCCY pistol in the video as one Ward had purchased for Frank.  Ronald Blanken also recognized the firearm in HADDOCK's hand because it had protruding from it an extended clip Frank had them buy at the Chantilly gun show.  Ronald Blanken also recognized an AR-15 pistol in the music video possessed by an unknown male as one that Ward had purchased for Frank.  At approximately 1 minute, 37 seconds into the "Blessings" music video, Ronald Blanken recognized another firearm as one he or Ward had purchased for Frank.

40.     Ronald Blanken further stated that he suspected that Frank was Brittany Blanken's pimp and was "tricking her out."

**E.     HADDOCK's request for additional firearms**

41.     On March 4, 2018, Ward sent me a screenshot of a text message conversation between herself and Frank. At approximately 8:14 a.m. that day, Frank contacted Ward through text message and stated, "I need u find a way we can go back in that show/shop.. I got [a money bag emoticon] WAITIN.. u kno I got u !!"

42.     Your affiant spoke with Ward later that afternoon and Ward explained the text messages were from Frank and stated, "That's from Frank, that's his number." Ward confirmed that Frank was asking Ward to purchase additional firearms for him from a gun show.

43.     On April 21, 2018, Ward sent me a screenshot of a text message conversation between herself and Frank. At approximately 11:00 a.m. that day, Frank contacted Ward through text message from an iPhone with an assigned phone number 571-288-5799, and stated, "Ima need u to make another move for us..u kno I got u". Ward responded by texting back, "Lemme know when, you said something forever ago and then y'all never came back." Ward's response was in reference to HADDOCK's earlier request for additional firearms on March 4, 2018. HADDOCK replied to Ward by stating, "I talk to the white boy up at Trojan...I'm tryna see if he gon hold something for me..but ima b back Wednesday so I'm tryna go Thursday most likely if u can".

44.     I spoke with Ward that afternoon and Ward confirmed that the text messages were from HADDOCK and he wanted Ward to acquire additional firearms for him on Thursday, April 26, 2018.

45.     Based on my training and experience, I know that the firearms purchased for
HADDOCK by Ward and/or Ronald Blanken constitute firearms pursuant to Title 18, United
States Code, Section 921(a)(3), were not manufactured in the State of Virginia, and, therefore,
these firearms traveled in, and/or affected interstate commerce.

46.     On April 26, 2018, I obtained a federal arrest warrant for HADDOCK with respect
to the aforementioned crimes. On April 27, 2018, ATF agents executed the arrest warrant in Upper
Marlboro, Maryland, and arrested HADDOCK. Agents seized two (2) Apple iPhones possessed
by HADDOCK incident to arrest.

47.     Officers seized the two Apple iPhones, (hereinafter "the Devices"), and they are
currently in the lawful possession of the ATF Washington Division. The Devices have been
stored in a manner in which its contents are, to the extent material to this investigation, in
substantially the same state as they were when the Devices first came into the possession of ATF
Washington Division.

48.     Based upon the information provided by Ward and Ronald Blanken, the rose gold
iPhone 8 described in Attachment A was frequently used by HADDOCK to coordinate firearms
trafficking and other criminal acts. Ward confirmed that she received text messages, phone calls,
and Instagram communications via the rose gold iPhone 8 described in Attachment A. Ward
also told agents HADDOCK had an iPhone X, which is the same type of phone as one of the
Devices agents seized from HADDOCK when they arrested him.

49.     Furthermore, the reliance of HADDOCK on electronic communication and the
frequency with which he uses social media, as well as the common knowledge that smartphones

15

like the Devices are used for communication and to access and post on social media, there is

probable cause to believe that the electronically stored information described in Attachment B is

recorded on the Devices described in Attachment A. HADDOCK likely used the Devices to

communicate with people to whom he sold the straw purchased firearms, to coordinate unlawful

prostitution, and communicate with others involved in his criminal activity, via phone calls, SMS

messages, and through various applications such as Instagram Direct Messenger. Electronic

devices such as the Devices maintain this electronically stored information, which can be

recovered by a digital media collection specialist.

50.     Based on my experience and training, and all the facts and opinions set forth in

this affidavit, I believe that information relevant to the unlawful activities of HADDOCK and

others, such as telephone numbers, made and received calls, contact names, electronic mail

(email) addresses, appointment dates, messages, pictures, and other digital information are stored

in the memory of the Devices described herein.

51.     While law enforcement may already have all necessary authority to examine the

Devices, I seek this additional warrant out of an abundance of caution to be certain that an

examination of the Devices will comply with the Fourth Amendment and other applicable laws.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

52. Based on my training, experience, and participation in firearms investigations, and the

training and experience of other law enforcement agents with whom I am working on this

investigation, I know that:

a.    It is common for individuals engaged in the illegal purchase or distribution of

16

firearms and "pimping" to use telephonic communications, both cellular (to

include voice and text messages) and hard line, to further their criminal activities

by coordinating the purchase and/or distribution of firearms, illegal proceeds of

such purchases and/or trafficking, the prostitution activities of those in the pimps

employ, and other efforts of co-conspirators.

b.   Individuals engaging in the illegal purchase or distribution of firearms and

pimping use cellular telephones and cellular telephone technology to

communicate and remain in contact with customers and the sources of those

firearms and/or women; and

c.   Individuals who engage in the illegal purchase or distribution of firearms and

illegal prostitution activities use cellular telephones to exchange information with

customers and/or sources of supply through text messaging and instant messaging

in addition to direct telephone conversations. It is also common for firearms

traffickers and pimps to send photographs and videos as exchange of information

with customers and/or source(s) of supply.

d.   Data extracted from cellular devices, including text messages and e-mails, can

provide law enforcement with details about an individual's residence and

locations where the individual frequents.

53. The Devices to be searched are a black Apple iPHONE Model X cellular phone, and

a rose gold Apple iPHONE Model 8 cellular phone. The Devices were seized from

HADDOCK's person during the course of his arrest on April 27, 2018. The Devices are

17

currently located at the ATF WASHINGTON FIELD DIVISION, Falls Church Field Office,

Leesburg Pike # 1050N, Falls Church, Virginia, 22043.

54. The applied-for warrant would authorize the forensic examination of the Devices for

the purpose of identifying electronically stored data particularly described in Attachment B.

## TECHNICAL TERMS

55. Based on my training and experience, I use the following technical terms to convey

the following meanings:

    a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data

        communication through radio signals.  These telephones send signals through

        networks of transmitter/receivers, enabling communication with other wireless

        telephones or traditional "land line" telephones.  A wireless telephone usually

        contains a "call log," which records the telephone number, date, and time of

        calls made to and from the phone.  In addition to enabling voice

        communications, wireless telephones offer a broad range of capabilities.

        These capabilities include: storing names and phone numbers in electronic

        "address books;" sending, receiving, and storing text messages and e-mail;

        taking, sending, receiving, and storing still photographs and moving video;

        storing and playing back audio files; storing dates, appointments, and other

        information on personal calendars; and accessing and downloading

        information from the Internet.  Wireless telephones may also include global

18

positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS: A GPS navigation device uses the Global Positioning System to display

its current location. It often contains records the locations where it has been.

Some GPS navigation devices can give a user driving or walking directions to

another location. These devices can contain records of the addresses or

locations involved in such navigation. The Global Positioning System

(generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting

the Earth. Each satellite contains an extremely accurate clock. Each satellite

repeatedly transmits by radio a mathematical representation of the current

time, combined with a special sequence of numbers. These signals are sent by

radio, using specifications that are publicly available. A GPS antenna on

Earth can receive those signals. When a GPS antenna receives signals from at

least four satellites, a computer connected to that antenna can mathematically

calculate the antenna's latitude, longitude, and sometimes altitude with a high

level of precision.

e.   IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet. An IP address is a series

of four numbers, each in the range 0-255, separated by periods (e.g.,

121.56.97.178). Every computer attached to the Internet computer must be

assigned an IP address so that Internet traffic sent from and directed to that

computer may be directed properly from its source to its destination. Most

Internet service providers control a range of IP addresses. Some computers

20

have static—that is, long-term—IP addresses, while other computers have
dynamic—that is, frequently changed—IP addresses.

f.  Internet: The Internet is a global network of computers and other electronic
devices that communicate with each other. Due to the structure of the
Internet, connections between devices on the Internet often cross state and
international borders, even when the devices communicating with each other
are in the same state.

56. Based on my training, experience, and research, I know that the Devices have
capabilities that allow them to serve as a repository of information that may provide crucial
evidence of the "who, what, why, when, where, and how" of the criminal conduct under
investigation, thus enabling the United States to establish and prove each element of a crime, or,
alternatively, to exclude the innocent from further suspicion. In my training and experience,
information stored within a wireless cellular telephone (e.g., registry information,
communications, images and movies, transactional information, records of session times and
durations, Internet history, and anti-virus, spyware, and malware detection programs) can
indicate who has used or controlled the Devices or other electronic devices. In my training and
experience, examining data stored on devices of this type can uncover, among other things,
evidence that reveals or suggests who possessed or used the Devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

57. Based on my knowledge, training, and experience, I know that electronic devices

21

can store information for long periods of time. These Devices are a type of wireless telephone that normally have internet access. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Devices. This information can sometimes be recovered with forensics tools.

58. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on the Device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how electronic devices works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

22

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how the Device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether they are evidence described by the warrant.

60. *Manner of execution.* Because this warrant seeks only permission to examine Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

61. Based on the aforementioned factual information, I respectfully submit that probable

23

cause exists to believe that HADDOCK has violated Title 18, United States Code, Section 922(g)(1), among other crimes, and that evidence, contraband, and fruits and instrumentalities of such crimes, as described in Attachment B, will be located on the Devices described in Attachment A.

62. This Court has jurisdiction to issue the requested warrant pursuant to Federal Rule of Criminal Procedure 41(b)(1). Specifically, "a magistrate judge with authority in the district … has authority to issue a warrant to search for and seize a person or property located within the district." Fed. R. Crim. Proc. 41(b)(1).

63. Based on the foregoing, I respectfully request that the Court issue the proposed search warrant.

Respectfully submitted,

Special Agent Bernard E. Mensah
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me
On the 9th of May, 2018.

/s/

Ivan D. Davis
United States Magistrate Judge

24

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched is one black Apple iPhone, Model X, and one rose gold

Apple iPhone, Model 8, cellular devices (hereinafter the "DEVICES") that were seized by ATF

from the person of Keith Haddock, II incident to his arrest on April 27, 2018. The DEVICES are

currently in ATF custody.

This warrant authorizes the forensic examination of the DEVICES for the purpose of

identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

## ITEMS TO BE SEIZED

1.      All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. § 922 and/or 18 U.S.C. § 1952 and involve HADDOCK since November 1, 2017, including:

      a.   Incoming/outgoing/missed phone call log(s);

      b.   SMS/MMS messages;

      c.   voicemail messages;

      d.   photographs and videos;

      e.   lists of customers and related identifying information (contact list);

      f.   any information related to the geographic location of the DEVICES;

      g.   The cellular telephone number;

      h.   types, amounts, and prices of firearms trafficked as well as dates, places, and amounts of specific transactions;

      i.   any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information);

      j.   any information recording HADDOCK's schedule or travel from November 1, 2017 to the present;

      k.   any information related to HADDOCK's involvement in coordinating prostitution activities; and

      l.   all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records involving the Internet:

a.   records of Internet Protocol addresses used;

b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3